UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JERRY ROCCO, | |
| Plaintiff, | |
| -against- | Case No. 1:23-cv-10973 (JLR) |
| NEW YORK STATE COURT OFFICERS ASSOCIATION, | **OPINION AND ORDER** |
| Defendant. | |

JENNIFER L. ROCHON, United States District Judge:

Plaintiff Jerry Rocco ("Plaintiff" or "Rocco") brings this action against Defendant New York State Court Officers Association ("Defendant" or the "COA") under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, alleging discrimination on the basis of his severe depression, tortious interference with his business relations, and creation of a hostile work environment that resulted in his constructive discharge. Dkt. 1 ("Compl.") ¶¶ 79-105. Now before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. Dkt. 36 ("Mot."). For the reasons that follow, Defendant's motion is GRANTED.

## BACKGROUND

The Court draws the following facts from the parties' summary judgment submissions, including Defendant's Local Rule 56.1 statement and Plaintiff's responses, as well as from the declarations of Michael DiBenedetto, Laura Cannon, Sandra Parker, and Plaintiff, and the exhibits attached thereto. *See* Dkt. 38 ("Br."); Dkt. 39 ("Def. SUF"); Dkt. 49 ("Pl. RSUF"); Dkt. 54 ("Opp."); Dkt. 56 ("Reply"); Dkt. 37 ("DiBenedetto Decl."); Dkt. 50 ("Rocco Decl."); Dkt. 51 ("Cannon Decl."); Dkt. 53 ("Parker Decl.").

## I.    Factual Background[1]

Plaintiff is a former employee of the New York State Unified Court System ("UCS"), having served as a court officer for UCS since February 2003.  Pl. RSUF ¶¶ 1-2.  Defendant did not employ Rocco in his position as a court officer, but at all relevant times served as the authorized labor representative for court officers employed by UCS.  *Id.* ¶¶ 3-4.  UCS is not a party to this action.  *Id.* ¶ 5.

For approximately thirteen years, Rocco worked at the Manhattan Criminal Courthouse at 100 Centre Street.  *Id.* ¶ 10; Rocco Decl. ¶ 12.  In 2016, he requested a transfer through UCS, which moved him to the Staten Island Criminal Court, where he worked for just under two years.  *See* Pl. RSUF ¶ 11; Rocco Decl. ¶¶ 12-13; Dkt. 46 ("Rocco Tr.") at 9:9-10:17.  Thereafter, Plaintiff voluntarily transferred back to the Manhattan Criminal Courthouse.  Rocco Decl. ¶ 14.

On March 3, 2019, Plaintiff's ex-wife sent Major John Allen ("Major Allen"), Plaintiff's supervisor at UCS, a written complaint alleging that Plaintiff had been having an affair with fellow court officer Laura Cannon ("Cannon") and that the two were having sex in the Manhattan Criminal Courthouse — where both were then assigned.  Pl. RSUF ¶14; Rocco Decl. ¶ 18; DiBenedetto Decl., Ex. B ("Mikos Tr.")[2] at 37:8-17, 58:23-59:18, 76:12-16; Rocco Tr. at 15:12-16; Rocco Tr. at 31:14-17 (identifying Laura Cannon as his current girlfriend).  His ex-

---

[1] There are discrepancies between the undisputed facts in the parties' Rule 56.1 statements, the factual backgrounds in their briefing, and Plaintiff's deposition testimony — namely with respect to certain dates and locations.  Where such discrepancies were apparent, the Court deferred to Plaintiff's deposition testimony or declaration so as to make all inferences in his favor as the nonmovant.

Unless otherwise noted, where Defendant's Local Rule 56.1 Statement is cited, Plaintiff either does not dispute the fact asserted, offers no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact.

[2] Stephen Mikos ("Mikos"), the current president of the COA, served as the COA's representative for purposes of its Rule 30(b)(6) deposition.  *See* Mikos Tr. at 1, 12:3-4.

wife's complaint also raised concerns about Rocco's mental state, claiming that Rocco had indicated that he was going to "blow his brains out."  Pl. RSUF ¶ 15; Rocco Decl. ¶ 19; Mikos Tr. at 35:5-11.  Rocco asserts that both allegations were false.  Rocco Decl. ¶¶ 18-19.

The next day, on March 4, 2019, Plaintiff was scheduled to appear at the firing range to re-qualify for firearm use.  *Id.* ¶ 21.  While Plaintiff was on his way to the range, Major Allen contacted him and instructed him not to report to the range, directing him instead to appear at Kings County Criminal Court.  *Id.* ¶ 22.  There, Major Allen informed Rocco of the allegations against him and suggested that he seek help through UCS's Worklife Assistance Program.  *Id.* ¶ 23.  Plaintiff asserts that, at Major Allen's urging, he "voluntarily" turned over his gun to Major Allen "for [Plaintiff's] protection" to prevent his ex-wife from "us[ing] it against [him]" and from suggesting "that [he] used a firearm in a threatening manner."  Rocco Tr. at 23:11-24:9; Pl. RSUF ¶ 18; Rocco Decl. ¶ 23.  Plaintiff's firearm privileges were thus revoked.  *See* Mikos Tr. at 48:20-23 ("[I]f a member threatens to blow their brains out, their firearm is getting pulled."); *see also* DiBenedetto Decl., Ex. D ("Letter Revoking Firearms Privilege") at 1 ("Please be advised that Judge Silver has directed that Officer Rocco's firearms privileges be revoked until further notice.").  Major Allen then directed Plaintiff to report to the COA's office because Dennis Quirk ("Quirk"), the COA's then-president, wanted to speak with Plaintiff.  Rocco Decl. ¶ 24.  Once in the COA's office, Plaintiff claims that Quirk berated him.  *Id.* ¶ 28.  Quirk told Rocco that he would no longer be working in the Manhattan Criminal Courthouse and would instead be transferred to the Richmond Criminal Court starting March 5, 2019.  *Id.*; Pl. RSUF ¶ 14; *see also* Mikos Tr. at 76:12-16 ("Q: Do you know why Mr. Rocco was transferred out of [Manhattan] [C]riminal [C]ourt?  A: Because of the letter his wife wrote to [the Inspector General of UCS] stating that he was having sex in the building with another officer.").

Meanwhile, the Inspector General of UCS opened an investigation into the allegations that Rocco's ex-wife had made against him. Pl. RSUF ¶ 16. Quirk, on behalf of the COA, represented Plaintiff in connection with that investigation. Rocco Tr. at 15:12-16:10. The investigation ultimately concluded with no further action being taken against Rocco. *See* Rocco Decl., Ex. 2 ("Nov. 2020 Investigatory Notification").

Plaintiff, however, never reported to the Richmond Criminal Court. Mikos at 80:25-81:12. Instead, Rocco took a leave of absence immediately following his March 4, 2019 conversation with Quirk. Pl. RSUF ¶ 17; Rocco Decl. ¶ 29. While on leave, on or about March 12, 2019, Rocco was diagnosed with Major Depression, for which he undertook a course of treatment that included therapy and medication. Rocco Decl. ¶ 31. Rocco reports, among other symptoms, that he was "unable to work at any job," "had trouble sleeping, thinking[,] and interacting with people," had difficulty "control[ling] [his] emotions," "was always too tired to do any physical activity," "was always anxious," "had difficulty concentrating," and "was forgetful, confused[,] and had trouble remembering things." *Id.* ¶¶ 36, 38-43. Rocco asserts that his condition has improved with treatment and medication, but, he "still ha[s] trouble interacting with people, eating, sleeping[,] and controlling [his] emotions." *Id.* ¶ 48. Rocco continues to receive treatment for his severe depression. *Id.* ¶ 49.

Rocco's mental health counselor, Linda Sykes ("Sykes"), cleared him to return to work on July 2, 2019. *See* Rocco Decl., Ex. 3 ("Duties Assessment"); *id.*, Ex. 4 ("Return to Work Certification"); *id.*, Ex. 5 ("Estimated Physical Capabilities Form"). Rocco's Duties Assessment gave Sykes the option to check "May" or "May Not" in assessing whether Rocco was, based on her medical diagnosis, able to "[c]arry (possess and retain) a service firearm." Duties Assessment at 1. Sykes indicated he "May," but also wrote in "N/A," noting that while Rocco "is stable," Rocco's performance of that duty would be "up to departmental regulations." *Id.*

4

Rocco subsequently underwent a medical and psychological evaluation, as mandated by his employer, UCS.  Rocco Decl. ¶ 50.  Thereafter, Judge Silver, the then-Deputy Chief Administrative Judge of New York City Courts — the same judge who had revoked Rocco's firearm privileges — determined on August 7, 2019, that Rocco may return to work the following day.  *Id.* ¶ 35.[3]

As part of the return-to-work process, Plaintiff submitted his medical documentation and Sykes's evaluations to UCS.  *Id.* ¶ 32.  Plaintiff believes that UCS then shared his records with the COA and Quirk.  *Id.* ¶ 34.  Subsequently, Rocco alleges that Quirk repeatedly called him while Rocco was still on leave, pressing him about returning to work and questioning him about his medication.  *Id.* ¶¶ 51, 54.

Rocco ultimately returned to work on August 8, 2019, now at the Red Hook Community Justice Center in Brooklyn, New York ("Red Hook").  *Id.* ¶ 56.  Though initially scheduled to return to Richmond Criminal Court, where he was reassigned before his leave, Plaintiff had to be transferred to Red Hook because Cannon had initiated a harassment action against Rocco's ex-wife that was set for adjudication at Richmond Criminal Court.  Mikos Tr. at 80:25-81:12.  Plaintiff alleges that following his return, one of his supervisors at UCS, Sergeant William Bauman ("Sergeant Bauman"), who was aware of Rocco's depression diagnosis, referred to him as "our resident psycho."  Rocco Decl. ¶ 63; Rocco Tr. at 30:7-31:5.  Rocco further alleges that Quirk likewise referred to him as the resident psycho — though Plaintiff has no firsthand knowledge of Quirk referring to him as such.  Rocco Tr. at 31:6-13.  Still other unidentified officers allegedly referred to Rocco as the "bomb," a word that Plaintiff alleges is "used to call

---

[3] Plaintiff identifies this August 7, 2019 letter as being an attached exhibit to his declaration, but no such letter is included in Plaintiff's submissions.

court officers who are not mentally competent." Rocco Decl. ¶ 65. Plaintiff was not given his firearm upon his return to Red Hook. *Id.* ¶ 23.

Approximately one year later, on September 16, 2020, Rocco requested a change in assignment back to 100 Centre Street. Pl. RSUF ¶ 25. That request was denied. *Id.* The parties dispute who was responsible for that denial and what role, if any, the COA played in it. Pl. RSUF ¶ 25.

While still working in Brooklyn, on March 27, 2021, Rocco had a physical altercation with another court officer, David Nieves ("Nieves"). *Id.* ¶ 24; Rocco Decl. ¶ 66; Rocco Tr. at 15:3-7, 19:3-20:22 (testifying that he and Nieves "got into a pushing and shoving altercation"). Mikos testified that Nieves told the COA that the dispute stemmed from Plaintiff regularly leaving garbage in shared spaces. Mikos Tr. at 56:10-57:2. After multiple attempts by other officers to convince Rocco to clean up after himself to no avail, Nieves allegedly placed some garbage in Rocco's locker. *Id.*; *but see* Rocco Decl. ¶ 66 (noting that the altercation stemmed from Nieves "harassing and bullying" him). Nieves returned to work after the altercation, but Plaintiff left for the day. Rocco Tr. at 20:11-16. Mikos testified that Major Harold Francis ("Major Francis"), the Major of Brooklyn Criminal Court, thereafter reached out to the COA to inform the union that Rocco appeared "so enraged" following the altercation that Francis did not believe Rocco "was in a good state of mind." Mikos Tr. at 93:17-94:5. Based on the information that Francis provided, the COA determined that it should conduct a wellness check on Rocco at his residence. *Id.* at 109:4-14. The matter was also referred to the Inspector General. Pl. RSUF ¶ 24.

During the wellness check, Rocco told Mikos that he had found garbage in his locker and learned that Nieves had placed it there. Mikos Tr. at 54:19-55:4. Rocco further recounted to Mikos that Rocco "beat the shit out of [Nieves]," *id.* at 55:2-8, and would "punch [Nieves] in his

6

face" if he sees him again because of the "disrespect[]" that he had shown Rocco with the garbage stunt, *id.* at 94:20-5. Mikos attempted to pacify Rocco and referred him to a mental health resource known as Forge Veterans First Responder, but Rocco declined the service. *Id.* at 95:6-14; *see also id.* at 90:11-22. Rocco alleges that during this wellness check, Mikos and a fellow COA delegate, Thomas Hinckey ("Hinckey"), told Rocco that he would never be transferred back to a Manhattan Criminal Court — where Rocco's girlfriend and fellow court officer Cannon worked — because of an incident where a male court officer who was dating a female court officer had gone to her home and attempted to kill her. Rocco Decl. ¶¶ 72, 76; Rocco Tr. at 43:2-44:9. Mikos denies having had this conversation. Mikos at 97:24-98:25.

Following the altercation between Nieves and Rocco, Chief Michael Senese ("Chief Senese") and the OCA decided to move Nieves and Rocco to different floors. Mikos at 100:14-19, 55:9-13. Neither Nieves nor Rocco was suspended. *Id.* at 55:14-20. Nieves was stripped of his firearm privileges and did not regain his right to carry his firearm until early 2024, nearly three years after the altercation. *Id.* at 55:9-10, 55:21-56:4. The Inspector General ultimately closed the matter without taking further action against Rocco. Pl. RSUF ¶ 24; Rocco Decl., Ex. 6 ("Mar. 2022 Investigatory Notification").

Less than one year after his altercation with Nieves, Rocco got into another altercation — this time with his supervisor, Sergeant Bauman. In reporting the incident, Sergeant Bauman recounted that on February 28, 2022, he received a call from the Inspector General's office, seeking answers to some questions about Rocco. DiBenedetto Decl., Ex. E ("Reassignment Email") at 1. Sergeant Bauman informed the office that he would not be answering any questions before speaking with the union. *Id.* Sergeant Bauman reported that when Rocco learned what had happened, "Rocco became irate and started yelling and screaming obscenities at [Sergeant Bauman] that [he] was a jerkoff for not talking to the [Inspector

7

General] and for calling the union." *Id.* Rocco then left work without permission and "screamed at [Sergeant Bauman] again on his way out." *Id.* Major Francis forwarded Sergeant Bauman's report of the incident to Chief Senese and noted that "it can be seen on [the courthouse's] security cameras the hostility and aggression displayed towards Sgt. Bauman." *Id.* In light of what he characterized as Rocco's "unacceptable and insubordinate" behavior, Chief Senese ordered Rocco reassigned to Bronx Criminal Court "effective immediately" and referred the incident to the Inspector General. *Id.*

After learning that he was being transferred to Bronx Criminal Court, Rocco decided to retire from his role at UCS. Rocco Decl. ¶ 84. The parties agree that the COA is notified of a UCS employee's transfer only after the reassignment has already been made. Pl. RSUF ¶ 27.

On September 22, 2022, Rocco filed charges with the New York State Division of Human Rights ("DHR") and the Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant "subjected him to discriminatory treatment and harassment, including subjecting him to a hostile work environment, based on the perceived mental condition that Plaintiff possessed dangerous, violent and vicious propensities, . . . and based on Plaintiff's mental impairment of severe depression." Compl. ¶ 11. DHR found that Plaintiff's claim was "unfounded." Rocco Tr. at 48:25-49:7. Specifically, DHR concluded that:

> The record lacks sufficient information to establish a correlation between complainant's disability and respondent's representation of him considering the multiple indications of undesirable interpersonal interactions between complainant and other staff members. It appears that these factors rather than [c]omplainant's diagnosis was a precursor for the transfer assignments referenced by the complainant.

*Id.* at 49:8-50:6. On September 21, 2023, "the EEOC issued Plaintiff a Notice of Right to Sue." Compl. ¶ 12.

8

## II.    Procedural History

Plaintiff commenced this action on December 19, 2023, within 90 days of receipt of the Notice of Right to Sue.  *See* Compl.  The Complaint asserts four causes of action against the COA: disability discrimination, hostile work environment, and constructive termination under the ADA, as well as a state-law tort claim for intentional interference with Plaintiff's business relationship with UCS.  *Id.* ¶¶ 79-105.  Defendant filed its answer on April 17, 2024.  Dkt. 14 ("Answer").  The action thereafter proceeded through discovery.

On March 17, 2025, Defendant moved for summary judgment.  *See* Mot.; Br.; Def. SUF. On May 23, 2025, Plaintiff filed his opposition.  *See* Opp.; Pl. RSUF.  On June 13, 2025, Defendant filed its reply.  *See* Reply.  The summary judgment motion is thus fully briefed.

### LEGAL STANDARD

Under Rule 56, a moving party is entitled to summary judgment if, on any claim or defense, that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it 'might affect the outcome of the suit under the governing law[,]' [and] [a] dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Rosen v. UBS Fin. Servs. Inc.*, No. 22-cv-03880 (JLR), 2023 WL 6386919, at *4 (S.D.N.Y. Sept. 29, 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact." *JTRE Manhattan Ave. LLC v. Cap. One, N.A.*, No. 21-cv-05714 (JLR), 2024 WL 3227010, at *8 (S.D.N.Y. June 27, 2024).

At summary judgment, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Estate of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting

9

*Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).  To defeat summary judgment, a nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion [for summary judgment] are not credible.'"  *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993); *accord Zaretsky v. William Goldberg Diamond Corp.*, 820 F.3d 513, 524 (2d Cir. 2016); *see also Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) ("[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion.").  That is, the nonmoving party must advance more than "a scintilla of evidence," *Liberty Lobby*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## DISCUSSION

Defendant moves for summary judgment on all four of Plaintiff's claims, arguing that Defendant is entitled to judgment as a matter of law on each count.  *See generally* Br.; Reply.  As set forth below, the Court agrees with Defendant and finds that no reasonable jury could find in Plaintiff's favor.

### I.    Disability Discrimination

Count I of the Complaint asserts a claim for disability discrimination under the ADA. Compl. ¶¶ 79-84.  Defendant argues that Plaintiff's ADA claims should be directed at his employer rather than at the COA, that Plaintiff is not a qualified individual under the ADA, and that, in any event, the record contains no evidence of discrimination.  Br. at 3-9; Reply at 3-7. Plaintiff responds that the COA, as a labor organization, is a proper ADA defendant, that he is a qualified individual within the meaning of the statute, and that his claim should instead be analyzed through the union's duty of fair representation, which he says the COA breached

through Quirk's conduct and the COA's alleged cooperation with UCS.  Opp. at 7-15.  The Court addresses each argument in turn.

### A.      The COA Was Not Plaintiff's Employer

As a threshold matter, Defendant argues that Plaintiff's ADA claims are improperly directed at the COA because UCS, rather than Defendant, was Plaintiff's employer.  Br. at 3-4. The Court agrees.

Plaintiff's Complaint asserts that Defendant is liable for disability discrimination because it functioned as Plaintiff's employer or joint employer under the ADA.  Compl. ¶¶ 26-28, 31 ("During Plaintiff's employment with UCS, Defendant and in particular Quirk has acted a[s] Plaintiff's joint employer with UCS."); Pl. RSUF ¶ 3 (admitting that "Defendant is not Plaintiff's Employer" but "affirmatively" responding "that Defendant conspired with and acted as Plaintiff's joint employer with UCS").  On the present facts, no reasonable juror could conclude that the COA acted as a joint employer.

The undisputed record establishes that UCS — not Defendant — employed Plaintiff as a court officer.  Pl. RSUF ¶¶ 1, 3.  Defendant was, at all times, merely the authorized labor representative for court officers employed by UCS.  *Id.* ¶ 4.  Where, as here, the plaintiff's theory is that the defendant union acted as an employer or joint employer, the court must consider certain "non-exhaustive factors drawn from the common law of agency, including control over an employee's hiring, firing, training, promotion, discipline, supervision, and handling of records, insurance, and payroll."  *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 838 (2d Cir. 2022); *see also Hinds v. PSEG Long Island LLC*, No. 23-cv-08701 (RER) (LGD), 2026 WL 266010, at *4 (E.D.N.Y. Feb. 2, 2026) (applying *Felder* in ADA context).  Defendant asserts that it did not hire or fire Plaintiff, administer his pay or benefits, maintain his employment records, directly supervise his day-to-day work, or make the final decisions concerning his transfers or firearm

11

privileges.  Br. at 3; *see* Mikos Tr. at 14:20-25 ("We don't remove firearms from court officers."); *accord id.* at 109:9-20; *id.* at 110:11-16 (testifying that the COA does not have the ability to hire or fire court officers); Pl. RSUF ¶ 27 ("Defendant becomes notified of a UCS employees transfer after the reassignment is made.").

In response, Plaintiff offers nothing more than his own say-so, *see* Rocco Tr. at 75:7-15 (testifying that he has no documentary evidence to support Count I of his complaint); *id.* at 76:7-78:13 (testifying he has no documentary evidence to support his joint-employer allegations, specifically), providing no evidence sufficient to create a triable issue that Defendant exercised the direct control needed to qualify as Rocco's joint employer.  *See, e.g.*, *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, No. 04-cv-00549 (NG) (LB), 2007 WL 2261652, at *8 (E.D.N.Y. Aug. 2, 2007) ("Since conclusory allegations are insufficient to avoid summary judgment, defendants' motion for summary judgment on plaintiff's ADA claim is granted."), *aff'd sub nom.*, *Zerilli-Edelglass v. N.Y.C. Transit*, 353 F. App'x 621 (2d Cir. 2009) (summary order).  Indeed, Plaintiff's own account of events establishes that UCS hired him in 2003, assigned him to various courthouses, supervised him through UCS personnel such as Major Allen and Sergeant Bauman, directed him to report to particular locations, confiscated his firearm, and required him to submit medical documentation and psychological clearance before returning to work.  *See* Pl. RSUF ¶¶ 1-2, 11, 14, 18; Rocco Decl. ¶¶ 18, 22-23, 32, 50, 63.  The specific events on which Plaintiff relies underscore that point.  The first key event occurred on March 4, 2019.  According to Plaintiff, Major Allen, a UCS supervisor, relieved him of his firearm, and suggested that he seek help through the UCS Worklife Assistance Program.  Rocco Decl. ¶¶ 22-23.  Only after those UCS actions did Major Allen direct Plaintiff to the COA's office to meet with Quirk.  *Id.* ¶ 24.  Plaintiff's narrative therefore places the critical employment decisions in UCS's hands from the outset.

12

The same is true of the later events.  Plaintiff alleges that Sergeant Bauman, a UCS supervisor, and other UCS employees mistreated him at Red Hook, *id.* ¶¶ 63, 65, and that later altercations with UCS personnel culminated in Rocco's transfer to Bronx Criminal Court, *id.* ¶ 66; *see also* Reassignment Email at 1.  Throughout this time, Plaintiff claims that Quirk frequently contacted him and inquired about his condition and medication.  Rocco Decl. ¶¶ 51, 54, 56.  But those allegations do not show that the COA had authority over Plaintiff's employment with UCS; at most they show that Quirk, as union president, inserted himself into disputes between Plaintiff and UCS.  Plaintiff has offered no evidence that the COA acted as a joint employer with UCS and, indeed, has conceded that COA personnel acted only in a support role while Rocco dealt with UCS supervisors and other officers.  *See, e.g.*, Rocco Tr. at 15:12-16:10 (testifying that Quirk represented Rocco in response to UCS investigation of Rocco's actions).  Accordingly, to the extent that Plaintiff's ADA discrimination claim rests on a joint-employer theory, his claim fails as a matter of law.  That alone ends the Court's inquiry.

### B.        The COA Is Not Liable for Breaching its Duty of Fair Representation

Perhaps recognizing the futility of his joint-employer theory, Plaintiff, in opposing summary judgment, reframes his ADA discrimination claim and argues — for the first time — that the relevant inquiry is instead whether Defendant, as a labor union, breached its duty of fair representation by colluding with UCS.  Opp. at 7-8, 11-12.  That theory is not properly before the Court.  *Sols. Express Ltd. v. Ashley Furniture Indus., Inc.*, No. 20-cv-07843 (CS), 2023 WL 2393861, at *6 n.8 (S.D.N.Y. Mar. 7, 2023) ("The law is clear that a party may not introduce a new theory in opposition to a motion for summary judgment.") (collecting cases); *accord Nagel v. Cnty. of Orange*, No. 09-cv-09960 (CS), 2013 WL 1285465, at *5 (S.D.N.Y. Mar. 28, 2013) (collecting cases); *see, e.g.*, *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (affirming district court's refusal to consider argument raised for the first time in

13

opposition to a summary judgment motion).  Even if Plaintiff had pleaded this labor-union

theory in the Complaint, this theory, too, is unavailing.

Covered entities under the ADA include "employer[s], employment agenc[ies], labor

organization[s], [and] joint labor-management committee[s]."  42 U.S.C. § 12111(2).  However,

"[e]mployment discrimination claims against labor organizations are analyzed differently from

claims against employers."  *Braxton v. TWU Loc. 100*, No. 16-cv-09425 (JPO), 2017 WL

6542500, at *2 (S.D.N.Y. Dec. 21, 2017) (quoting *Klaper v. Cypress Hills Cemetery*, No. 10-cv-

01811 (NGG) (LB), 2012 WL 959403, at *7 (E.D.N.Y. Mar. 21, 2012)).  Because "[c]laims

against labor organizations are grounded in the union's duty of fair representation . . . to its

members . . . , a plaintiff must make two showings to prevail on a[n] . . . ADA claim against a

union: (1) 'that the union breached its duty of fair representation'; and (2) 'that the union's

actions were motivated by discriminatory animus.'"  *Klaper*, 2012 WL 959403, at *7 (alteration

adopted) (quoting *McIntyre v. Longwood Cent. Sch. Dist.*, 380 F. App'x 44, 49 (2d Cir. June 4,

2010) (summary order)); *accord Langenback v. 32BJ SEIU*, No. 24-cv-03574 (OEM) (CLP),

2025 WL 2240321, at *6 (E.D.N.Y. Aug. 6, 2025), *appeal dismissed*, 2026 WL 497816 (2d Cir.

Jan. 22, 2026); *Durant v. Union Loc. 237*, No. 12-cv-01166 (NGG) (JMA), 2013 WL 1232555,

at *3 (E.D.N.Y. Mar. 4, 2013), *report and recommendation adopted*, 2013 WL 1247520

(E.D.N.Y. Mar. 26, 2013).

As to the first prong, "[w]hen a plaintiff sues a labor union alleging that the union

breached its [duty of fair representation], the court's review of that alleged breach 'must be

highly deferential, recognizing the wide latitude that unions need for the effective performance

of their bargaining responsibilities.'"  *Klaper*, 2012 WL 959403, at *7 (alteration adopted)

(quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991)).  Breach of the duty of

fair representation occurs only when a union's conduct toward one of its members "is arbitrary,

14

discriminatory or in bad faith" or "when [the union] causes an employer to discriminate against employees on arbitrary, hostile, or bad faith grounds." *Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 277 (2d Cir. 2004) (internal quotation marks and citations omitted); *accord Vaca v. Sipes*, 386 U.S. 171, 190 (1967). "[T]he duty of fair representation is not[, however,] breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance." *Cruz v. Loc. Union No. 3 of Int'l Bd. of Elec. Workers*, 34 F.3d 1148, 1153-54 (2d Cir. 1994); *accord Klaper*, 2012 WL 959403, at *8. "[E]stablishing that the union's actions were sufficiently 'arbitrary, discriminatory or in bad faith,' is only the first step toward proving a fair representation claim. Plaintiff[] must then demonstrate a causal connection between the union's wrongful conduct and [his] injuries." *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1988); *accord Naugler v. Air Line Pilots Ass'n, Int'l*, No. 05-cv-04751 (NG) (VVP), 2012 WL 1215291, at *9 (E.D.N.Y. Apr. 11, 2012), *aff'd sub nom.*, *Alen v. U.S. Airways, Inc.*, 526 F. App'x 89 (2d Cir. 2013) (summary order).

As to the second prong, "a plaintiff asserting claims under . . . the ADA must allege that h[is] mistreatment 'was motivated by either discriminatory animus or ill will due to disability.'" *Berk v. City of New York*, No. 20-cv-02490 (LLS), 2020 WL 4700900, at *5 (S.D.N.Y. Aug. 13, 2020) (quoting *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 112 (2d Cir. 1998)); *see also Davis v. Wild Friends Foods, Inc.*, No. 22-cv-04244 (LJL), 2023 WL 4364465, at *8 (S.D.N.Y. July 5, 2023) ("To state a claim for intentional discrimination, or disparate treatment, under the ADA, Plaintiff must present evidence that animus against the protected group was a significant factor in the position taken by Defendant." (alterations adopted) (internal quotation marks and citation omitted)). ADA discrimination claims are analyzed under the burden-shifting test set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

15

*Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999); *accord Ugactz v. United Parcel Serv., Inc.*, No. 10-cv-01247 (MKB), 2013 WL 1232355, at *7 (E.D.N.Y. Mar. 26, 2013).  Under the *McDonnell Douglas* test, "[a] plaintiff must establish a prima facie case; the employer must [then] offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). As described below, Plaintiff has likely not established a *prima facie* case, but assuming *arguendo* that he has, Plaintiff fails to show that Defendant's proffered non-discriminatory bases for the actions taken against Plaintiff are pretextual.  *Lyons v. New York Life Ins. Co.*, No. 20-cv-03120 (PAE), 2022 WL 837202, at *15 n. 24 (S.D.N.Y. Mar. 21, 2022) ("Given the relative ease of meeting a *prima facie* burden, courts in this District often assume such *arguendo* and proceed to the subsequent *McDonnell Douglas* steps.") (collecting cases).

In support of his claim for a breach of the duty of fair representation, Plaintiff alleges that Quirk persistently bullied, harassed, and threatened him due to his depression, including repeated phone calls to both Rocco and Cannon demanding updates on Plaintiff's medication.  Opp. at 12. Plaintiff contends that the COA further violated its duty of fair representation by cooperating with UCS to allegedly breach the collective bargaining agreement through punitive transfers and continued withholding of Rocco's firearm.  *Id.* at 11, 14.  For the reasons described below, Plaintiff's ADA discrimination claim fails on the merits.

### 1.  *Plaintiff Is a Qualified Individual Under the ADA*

As a threshold matter, the Court agrees with Plaintiff that he is a "qualified individual" under the ADA.  Defendant contends that Plaintiff's depression was too brief to render him a "qualified individual" for purposes of the ADA, emphasizing that Plaintiff's condition rendered

him unable to work only for a limited period before he returned to duty.  Br. at 4-8; Reply at 4-6.  Plaintiff responds by pointing to his diagnosis of Major Depression, his course of therapy and medication, and his continuing symptoms.  Opp. at 8-11.  Plaintiff has the better argument.

"Disability determination under the ADA 'is an individualized inquiry' that does not rest on the mere diagnosis of an impairment." *Grullon v. Admin. for Child.'s Servs.*, No. 18-cv-03129 (LJL), 2021 WL 981848, at *12 (S.D.N.Y. Mar. 16, 2021) (quoting *Sutton v. United Airlines*, 527 U.S. 471, 483 (1999)).  The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102(1)(A).  "Courts in this [C]ircuit have found that depression may qualify as a disability for purposes of the ADA, 'provided that the condition is not a temporary psychological impairment,' and the condition substantially limits a major life activity." *MacEntee v. IBM (Int'l Bus. Machs.)*, 783 F. Supp. 2d 434, 443 (S.D.N.Y. 2011) (internal quotation marks and citation omitted) (quoting *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 539 (S.D.N.Y. 2009)), *aff'd sub nom.*, *MacEntee v. IBM*, 471 F. App'x 49 (2d Cir. 2012) (summary order).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  Regulations promulgated under the ADA counsel that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA," as the phrase "is not meant to be a demanding standard."  29 C.F.R. § 1630.2(j)(1)(i).  "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication[.]"  42 U.S.C. § 12102(4)(E)(i)(I).

17

Here, Plaintiff has provided proof of his Major Depression diagnosis. *See generally* Dkt. 52-2 ("Rocco Medical Records"). He has also identified several major life activities that were limited by his condition both before and after he obtained medication and underwent therapy. Rocco Decl. ¶¶ 36, 38-48. Though Plaintiff maintains that, following treatment, he was able to perform the essential functions of a court officer, Compl. ¶ 46, that does not undermine his claim that some of his other major life activities, including sleeping, eating, and communicating, remain substantially limited, Rocco Decl. ¶ 48.

In challenging the ADA's applicability to Plaintiff, Defendant takes the position that "to constitute a substantial impairment, the impact of the impairment must be 'permanent or long term.'" Reply at 5 (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002)). But *Toyota*'s more exacting standard for impairment was legislatively overruled by U.S. Pub. L. 110-325 (2008), which amended the ADA "to convey congressional intent that the standard created by the Supreme Court in [*Toyota*] for 'substantially limits' . . . has created an inappropriately high level of limitation necessary to obtain coverage under the ADA." U.S. Pub. L. 110-325, 122 Stat. 3554 (2008). And, in any event, Plaintiff asserts that his depression, impairments, and treatment are ongoing — they did not disappear after Plaintiff returned from his leave.

Plaintiff has accordingly established that he is a "qualified individual" under the ADA. Nevertheless, his discrimination claim fails for want of a materially adverse action caused by discriminatory animus.

### 2. *Plaintiff Did Not Experience Adverse Employment Actions Caused by Discriminatory Animus*

Plaintiff claims the COA breached its duty of fair representation by permitting UCS to violate the collective bargaining agreement through punitive transfers and withholding of

Rocco's firearm. Opp. at 11, 14. However, Plaintiff's two transfers, first to Red Hook and then to Bronx Criminal Court, do not qualify as adverse employment actions. A lateral reassignment, without a materially significant change in compensation, benefits, title, responsibilities, or prestige, is not an adverse employment action merely because the employee views the new assignment as less desirable. *See, e.g.*, *Pimentel v. City of New York*, 74 F. App'x 146, 148 (2d Cir. 2003) (summary order) ("[A] forced transfer, or denial of a transfer, is not an adverse employment action if the terms, privileges, duration, or condition of a plaintiff's employment do not change."); *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86-87 (2d Cir. 2001) (holding that a compelled move to a different work location did not constitute an adverse employment action where the plaintiff was unable to show that the transfer resulted in a meaningful alteration of her employment terms or conditions). Plaintiff identifies no evidence that his reassignment to either Red Hook or Bronx Criminal Court resulted in any reduction in pay, benefits, rank, responsibilities, or prestige. His showing as to the Bronx assignment is especially thin: Plaintiff offers only the conclusory assertion that it was "one of the worst assignments." Compl. ¶ 77; *but see* Mikos Tr. at 86:8-88:13 (responding, when asked whether officers would view a transfer to the Bronx as a punishment, that they would not because officers "do the same thing in every building in every borough"). While he also notes that he preferred the Manhattan Criminal Court because it was more conveniently located and because he was more familiar with the personnel there, Rocco Decl. ¶ 75, that subjective preference is not enough to transform the reassignment into an adverse employment action, *see, e.g.*, *Duncan v. Shalala*, No. 97-cv-03607 (SJ), 2000 WL 1772655, at *1, *4 (E.D.N.Y. Nov. 29, 2000) (finding that "denial of a hardship transfer request" so that employee could live near his wife was not "an adverse employment action"). On this record, no reasonable jury could conclude that either transfer materially altered the terms and conditions of Plaintiff's employment. *See Galabya v.*

19

*New York City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000) (affirming summary judgment where "[a]ppellant ha[d] not produced evidence to show that the transfer was to an assignment that was materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement"), *abrogated on other grounds by Hicks v. Baines*, 593 F.3d 159 (2d Cir. 2010).

Plaintiff's loss of firearm privileges stands differently. Because carrying a firearm is plainly significant to a court officer's duties, the Court assumes that the continued withholding of Plaintiff's firearm qualifies as an adverse action. *See Terry v. Ashcroft*, 336 F.3d 128, 142-43 (2d Cir. 2003) ("[A] reasonable fact-finder could conclude that the suspension of [plaintiff]'s firearms privileges constituted an adverse employment action."); *accord Bodenmiller v. Cnty. of Suffolk*, No. 20-cv-00414 (JMA) (ARL), 2021 WL 4555884, at *9 (E.D.N.Y. Aug. 30, 2021), *report and recommendation adopted*, 2021 WL 4553177 (E.D.N.Y. Oct. 5, 2021). But that assumption does not salvage Plaintiff's claim, because Plaintiff has not adduced evidence from which a reasonable jury could find that the deprivation was imposed because of his disability rather than for legitimate, nondiscriminatory reasons.

Plaintiff's allegations regarding the COA's actions are devoid of any facts from which the Court can infer discrimination on the basis of Plaintiff's disability. First, even assuming *arguendo* that the transfers were adverse, the record reflects nondiscriminatory reasons for them. Plaintiff's own account is that his first reassignment out of Manhattan Criminal Court followed his ex-wife's written complaint that Plaintiff was involved in a romantic relationship with fellow court officer Cannon and that the two were engaging in misconduct at the courthouse. Pl. RSUF ¶14; Rocco Decl. ¶ 18. Mikos testified that Plaintiff was transferred from Manhattan because of that complaint. Mikos Tr. at 58:23-59:18, 76:12-16. Plaintiff, moreover, concedes that Cannon is his girlfriend, and that she remained stationed at Manhattan Criminal Court at the time that

20

Rocco was seeking reassignment to that location. Rocco Tr. at 31:14-17, 43:2-44:9. According to Plaintiff, in response to him inquiring about a transfer back to Manhattan, the COA delegates replied that Rocco would never again be assigned to Manhattan because of an earlier incident involving a male court officer dating a female officer who then tried to kill her. Rocco Decl. ¶¶ 72, 76; *see also* Mikos at 97:24-98:25 (denying that conversation took place). Whatever the wisdom or fairness of that explanation, it points to a workplace-management or safety rationale tied to Plaintiff's relationship with Cannon, not animus toward depression.

Plaintiff's second reassignment, to Bronx Criminal Court, followed his February 2022 altercation with Sergeant Bauman, which, in turn, followed a physical altercation between Rocco and Nieves in March 2021. Pl. RSUF ¶ 24; Rocco Decl. ¶ 66; Rocco Tr. at 15:3-7, 19:3-20:22; Reassignment Email at 1. Specifically, Plaintiff alleges that in February 2022 the Inspector General contacted Sergeant Bauman about the May 2021 incident involving Plaintiff and Nieves; that Sergeant Bauman refused to answer questions before speaking with the union; and that Plaintiff became upset and confronted Sergeant Bauman. Rocco Tr. at 39:21-40:13. Again, Plaintiff's narrative ties that event to a workplace confrontation, not to disability. The record reflects that Chief Senese ordered the Bronx reassignment after reviewing Sergeant Bauman's account of the altercation and being informed that courthouse security footage confirmed Rocco's hostility and aggression toward Sergeant Bauman. Reassignment Email at 1. Defendant also notes that, following the Nieves incident, UCS had already determined that Plaintiff and Nieves should be separated. Mikos at 100:14-19, 55:9-13. Plaintiff offers no competent evidence from which a reasonable jury could conclude that these stated reasons were false or that disability discrimination was the actual motive.

Notably, Plaintiff characterizes both the Red Hook and Bronx transfers as disciplinary and contrary to paragraph 13.13(a) of the collective bargaining agreement, Opp. at 14, which

21

provides that "[n]o employee shall be transferred for the purpose of imposing discipline," Rocco Decl., Ex. 1 ("Collective Bargaining Agreement") at 50.  But even if a jury were to accept that the transfers were imposed as punishment — rather than as a safety measure — the COA's failure to prevent those transfers would show, at most, that the COA acquiesced in a disciplinary reassignment.  It would not show, as is required for a disability discrimination claim, that the COA failed to act because of Plaintiff's depression.  *See Berk*, 2020 WL 4700900, at *5 ("[A] plaintiff asserting claims under . . . the ADA must allege that h[is] mistreatment was motivated by either discriminatory animus or ill will due to disability." (internal quotation marks and citation omitted)).

The same is true of the firearm restriction.  By Plaintiff's own account, he *voluntarily* turned over his weapon on March 4, 2019, before his March 12, 2019 depression diagnosis. Rocco Tr. at 23:11-24:9; Pl. RSUF ¶ 18; Rocco Decl. ¶ 31.  The record also reflects that the surrender occurred after Plaintiff's ex-wife made written allegations raising concerns about Plaintiff's mental state and possible ideation of suicide through use of a firearm.  Pl. RSUF ¶ 15; Rocco Decl. ¶ 19; Mikos Tr. at 35:5-11.  Defendant points to testimony from Mikos that removal of a firearm under such circumstances is standard UCS policy; that an officer's firearm is not returned while an investigation remains pending; and that, even after a matter is closed, there is an approximate six-month waiting period before the officer may seek reinstatement so that UCS can ensure no further incidents occur.  Br. at 8; Mikos Tr. at 20:2-21:6.  Here, the initial Inspector General investigation remained open until November 2020.  *See* Nov. 2020 Investigatory Notification.  Then, during the ensuing six-month period, Plaintiff was involved in the March 2021 altercation with Nieves.  Pl. RSUF ¶ 24; Rocco Decl. ¶ 66.  Mikos testified that Nieves, too, had his firearm withheld following that incident and did not regain it for years. Mikos Tr. at 55:9-10, 55:21-56:4.  Mikos further testified that a court officer may seek

restoration of firearm privileges through submission to the COA of a supervisor support letter, which the COA then forwards to UCS. *Id.* at 22:3-16. Plaintiff does not identify evidence that he pursued that process, nor does he point to evidence, beyond his own assertion, Rocco Tr. at 27:21-28:11, that Defendant or UCS imposed some permanent disability-based bar on his firearm rights. The only reasonable inference supported by the record is that Plaintiff's firearm remained withheld because of the allegations against him, the pendency of investigations, the applicable waiting period, and Plaintiff's subsequent workplace altercations — not because of his depression.

Finally, Plaintiff points to Quirk's alleged calls during his leave, questions about medication, threats of another psychological test, and use of the phrase "resident psycho" as support for Rocco's breach of duty of fair representation claim. Opp. at 5, 12. Assuming those allegations to be true, while such language is not appropriate, it is insufficient to support a claim that the COA discriminated against Rocco because of his disability. Plaintiff offers no evidence that Quirk or the COA controlled the employment decisions concerning Plaintiff's transfers and removal of his firearm. Indeed, the COA, and Quirk in particular, successfully represented Plaintiff during the investigations into Plaintiff's conduct. Rocco Tr. at 15:12-16:10. Despite Plaintiff's repeated violent interactions with courthouse staff and his problematic relationship with Cannon, the Inspector General never ordered that additional action be taken against Rocco, and Rocco was never terminated. *See* Nov. 2020 Investigatory Notification ("No further action in this matter is contemplated at this time"); Mar. 2022 Investigatory Notification. That is a far cry from a supposed failure on the COA's part to fairly represent Plaintiff.

In short, given Rocco's ongoing interpersonal issues with other staff, the record does not support a reasonable inference that Defendant took an adverse action because of Plaintiff's disability. Summary judgment is therefore granted on Plaintiff's disability-discrimination claim.

23

## II.    Hostile Work Environment and Constructive Termination

Counts II and III of Plaintiff's Complaint allege creation of a hostile work environment and constructive termination under the ADA, respectively.  Compl. ¶¶ 85-96.  With respect to these claims, Defendant argues that Plaintiff's allegations, even if accepted, do not establish severe or pervasive harassment, do not show a nexus to protected status, and do not rise to the level of constructive discharge.  Br. at 9-14.  Plaintiff answers that Quirk's repeated calls, comments about his mental condition, threats of transfer, and failure to protect him from disciplinary reassignments created an intolerable environment that forced his retirement.  Opp. at 11-15.

Plaintiff's two theories are related but distinct.  "In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'"  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (internal quotation marks omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *accord Howard v. City of New York*, 302 F. Supp. 2d 256, 262 (S.D.N.Y. 2004), *aff'd*, 363 F. App'x 805 (2d Cir. 2010) (summary order).  "Isolated instances of harassment ordinarily do not rise to the level of a hostile work environment."  *Sabra v. Shafer*, No. 04-cv-02759 (LTS) (KNF), 2008 WL 2787964, at *9 (S.D.N.Y. July 17, 2008).  Rather, Plaintiff must show "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment."  *Cruz*, 202 F.3d at 570 (internal quotations and citations omitted).  "In determining whether an actionable hostile work environment claim exists, [the court] look[s] to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

24

unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotation marks omitted). "To plead union liability, Plaintiff must plead (1) the existence of a hostile work environment, (2) that a union representative caused or attempted to cause the hostile work environment, and (3) that the representative's conduct may properly be imputed to the union." *Morren v. New York Univ.*, No. 20-cv-10802 (JPO) (OTW), 2022 WL 1666918, at *18 (S.D.N.Y. Apr. 29, 2022), *report and recommendation adopted*, 2022 WL 1665013 (S.D.N.Y. May 25, 2022).

Constructive termination requires more. "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry*, 336 F.3d at 151-52. Plaintiff must show working conditions "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996) (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987)); *see also Petrosino v. Bell Atl.*, 385 F.3d 210, 229-30 (2d Cir. 2004). "[T]his issue is assessed objectively by reference to a reasonable person in the employee's position." *Petrosino*, 385 F.3d at 230; *accord Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004). In either context, Plaintiff must show a causal nexus between the challenged conduct and disability. *Johnson v. City of New York*, No. 10-cv-06294 (RJS), 2012 WL 1076008, at *6 (S.D.N.Y. Mar. 28, 2012) ("[I]t is axiomatic that Plaintiff must establish that the hostile conduct occurred on account of his disability to make out a disability-based hostile work environment claim."); *Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 49 (2d Cir. 2014) (finding that constructive discharge claim requires a showing that the discharge was driven by the alleged disability).

### A.       Hostile Work Environment

Plaintiff's hostile-work-environment claim fails because the evidence, even if credited, would not permit a reasonable jury to find that the COA subjected Rocco to severe or pervasive disability-based hostility.

Rocco alleges that after he took leave in March 2019 and was diagnosed with depression, Quirk began calling him in May 2019, badgering him about when he would return to work and accusing him of using depression as a pretext to avoid work.  Rocco Decl. ¶¶ 51, 54.  Plaintiff says he told Quirk he was under a doctor's care, was taking medication, and could not work.  *Id.* ¶ 52.  He further alleges that Quirk nevertheless continued, including by making roughly seven calls in July 2019 harassing Rocco about returning and interrogating him about his medication. *Id.* ¶ 54.  However, such conduct, which occurred while the Plaintiff "was on leave, has no bearing on [P]laintiff's hostile work environment claim, which requires evidence of harassment in the 'workplace.'"  *Krachenfels v. N. Shore Long Island Jewish Health Sys.*, No. 13-cv-00243 (JFB) (WDW), 2014 WL 3867560, *10 (E.D.N.Y. July 29, 2014); *accord Paola v. DeJoy*, 624 F. Supp. 3d 305, 320 (W.D.N.Y. 2022); *Miller v. Buffalo Pub. Schs.*, No. 18-cv-00583 (LJV) (JJM), 2021 WL 8316489, at *4 (W.D.N.Y. Nov. 4, 2021), *report and recommendation adopted*, 2022 WL 1407672 (W.D.N.Y. May 4, 2022).

With respect to post-leave conduct, Plaintiff alleges that after he returned to Red Hook, Sergeant Bauman often called him "our resident psycho," Rocco Decl. ¶ 63; Rocco Tr. at 30:7-31:5, and other officers called him "the bomb," which Plaintiff says was a term for officers thought "not mentally competent," Rocco Decl. ¶ 65.  Rocco further alleges that he learned, from Cannon, that Quirk had likewise called him the "resident psycho."  Rocco Tr. at 31:6-13.  Later, following the wellness check conducted by the COA stemming from Plaintiff's physical

26

altercation with Nieves, Plaintiff alleges that Quirk threatened another psychological test, transfer to the Bronx, and firing.  Rocco Decl. ¶ 72.

While these insensitive references to Plaintiff's mental health are not appropriate, the question at summary judgment is whether Plaintiff has produced evidence from which a reasonable jury could find a hostile environment attributable to the COA and grounded in disability discrimination rather than general workplace discord.  He has not.

First, much of the conduct Plaintiff describes was not conduct by the COA at all, but by UCS personnel or coworkers.  Sergeant Bauman was one of Plaintiff's UCS supervisors at Red Hook.  Rocco Decl. ¶¶ 62-63; Rocco Tr. at 31:3-5.  Allegations of remarks by fellow court officers, Rocco Decl. ¶ 65, without more, also cannot be attributed to the COA.  *Cf. Whyte v. Nassau Health Care Corp.*, 969 F. Supp. 2d 248, 258 (E.D.N.Y. 2013) ("[C]omments from plaintiff's co-workers, who had no supervisory authority over the plaintiff, cannot be imputed on the defendant."); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 359 (S.D.N.Y. 2006) ("Employers are not generally liable for the harassing behavior of a plaintiff's co-workers; to find an employer liable for a hostile work environment claim, the harassment must generally come from a supervisor with immediate or successively higher authority over a Plaintiff."); *accord Mack v. Otis Elevator Co.*, 326 F.3d 116, 123 (2d Cir. 2003), *abrogated on other grounds by Vance v. Ball State Univ.*, 570 U.S. 421 (2013).  With respect to Quirk's comment, Plaintiff offers no admissible evidence that Quirk referred to him as the "resident psycho."  He notes that he heard from Cannon that Quirk had made that statement.  Rocco Tr. at 31:6-13.  Yet, Cannon's declaration makes no mention of such conduct by Quirk.  *See generally* Cannon Decl.

Second, Plaintiff's evidence of union responsibility is sparse, and Plaintiff has not shown that the union, as opposed to UCS supervisors and coworkers, controlled the conditions of his employment.  Rocco offers no documentary proof that the COA adopted, endorsed, or ratified a

27

discriminatory course of conduct.  Instead, he relies heavily on Quirk's status as union president, and on *Agosto v. Correctional Officers Benevolent Ass'n*, 107 F. Supp. 2d 294 (S.D.N.Y. 2000) to impute Quirk's conduct to the COA.  Opp. at 13 & n.5.  In *Agosto*, the court held that for "a union representative's role in causing or attempting to cause a hostile work environment to be properly imputed to a union, a plaintiff must show not only that the union had actual or imputed knowledge of the improper conduct, but also that the union representative's conduct related to union activity and that therefore, in acting in such a manner, the representative breached the duty of fair representation."  *Agosto*, 107 F. Supp. 2d at 308.  "Put differently, 'a union's liability . . . rests on the union's duty of fair representation.'"  *Maron v. Legal Aid Soc'y*, 605 F. Supp. 3d 547, 567 (S.D.N.Y. 2022) (quoting *Agosto*, 107 F. Supp. 2d at 308).

The *Agosto* court denied summary judgment on the plaintiff's hostile work environment claim in light of the "ample evidence of notice of [the union representative]'s conduct to the Union's officers," namely the plaintiff's filing of grievances against the representative.  *Agosto*, 107 F. Supp. 2d at 309 n.11.  In so doing, the court specifically found that the union had also breached its duty of fair representation.  *Id.* at 308.  Relevant here, the court in *Agosto* found it "unnecessary . . . to resolve . . . whether discrimination by a union delegate requires actual knowledge or whether knowledge is properly imputed to the union in such circumstances."  *Id.* at 309 n.11.  Unlike the plaintiff in *Agosto*, Plaintiff has not provided any evidence substantiating the COA's knowledge of a hostile work environment.  Rocco Tr. at 75:16-23 (testifying that he has no documentary evidence as to Counts II and III).  But even if knowledge of Quirk's actions, taken by the COA's then-president, could have been imputed to the COA, *cf. Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246 (2d Cir. 1995) ("The knowledge of a director, officer, . . . or controlling person of a corporation is imputable to that corporation." (citation omitted)), as

28

outlined above, *supra* Section I.B., Plaintiff has failed to show that the COA breached the duty of fair representation. *Agosto* cannot, therefore, save Plaintiff's claim.

Third, the record does not support an inference of severe and pervasive conduct necessary for a hostile work environment claim. The comments that Plaintiff recounts were inappropriate if made, but the record does not show the sort of unremitting disability-based intimidation that courts typically require. Remarks by Rocco's coworkers and Quirk were episodic, rather than "continuous and concerted." *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 458 (S.D.N.Y. 2013) (citation omitted), *aff'd sub nom.*, *Dabney v. Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014) (summary order); *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) ("Stray remarks, even if made by a decision maker, do not constitute sufficient evidence to make out a case of employment discrimination."); *MacEntee*, 783 F. Supp. 2d at 445 ("[Plaintiff's supervisor]'s alleged conduct is insufficiently severe or pervasive to create an objectively hostile or abusive work environment sufficient to establish a prima facie hostile work environment claim."). In addition, Quirk's references to transfers and termination unfolded against a background of multiple non-disability-related disputes: the allegations made by Plaintiff's former spouse, the Cannon relationship, the investigation into Plaintiff's conduct, Plaintiff's altercation with Nieves, and the later dispute with Sergeant Bauman. And the most consequential events in Plaintiff's work life during this period — the loss of his firearm, his reassignment, his medical leave, and his later transfer — were connected on this record to safety concerns, interpersonal conflict, or workplace investigations.

Plaintiff has therefore not raised a triable issue that the COA created or maintained a hostile work environment because of Rocco's disability. Summary judgment is therefore granted on that claim.

### B.     Constructive Termination

For much the same reasons, Plaintiff's constructive-termination claim also fails.  Plaintiff must show conditions so intolerable that a reasonable person in his position would have felt compelled to resign.  *Terry*, 336 F.3d at 151-53.  That standard is higher than the standard for a hostile work environment claim.  *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) ("Th[e] standard [for constructive discharge] is higher than the standard for establishing a hostile work environment.  Because [plaintiff] failed to establish a hostile work environment, h[is] claim of constructive discharge also fails." (citation omitted)); *accord United States v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 365, 395 (S.D.N.Y. 2018).

Plaintiff alleges that Quirk's "pervasive bullying and harassment" and his role in the Bronx transfer forced Plaintiff to retire.  Opp. at 13; Rocco Decl. ¶ 84.  The facts on which Plaintiff relies are essentially the same as those offered in support of the hostile-work-environment claim: Quirk's badgering calls, comments about medication, threats of psychological testing and firing, refusal to secure a Manhattan reassignment, and alleged acquiescence in transfers that Plaintiff says were disciplinary.  Plaintiff contends that after Quirk took no action to address the supposed contract violation represented by the Bronx transfer, Rocco had no choice but to retire.  Rocco Decl. ¶¶ 77, 82-84.

Plaintiff's proffered facts do not enable a reasonable juror to find in Rocco's favor.  Plaintiff's first reassignment followed the events involving Cannon and the allegations from his former spouse.  His later transfer followed a dispute involving Sergeant Bauman and a prior workplace incident under investigation.  The calls and threats Plaintiff recounts, though unpleasant, do not make resignation the only reasonable option.  Nor does Plaintiff show that the COA, rather than UCS, deliberately created allegedly intolerable conditions.  The record instead shows an extended and bitter employment dispute in which Plaintiff believed his union did not

adequately defend him.  That may describe an unsatisfactory representational relationship.  But it does not support constructive discharge on this record.  *See Petrosino*, 385 F.3d at 231-32 (holding that mere dissatisfaction with working conditions is not sufficient to support a constructive discharge claim); *Martin v. Citibank, N.A.*, 762 F.2d 212, 221 (2d Cir. 1985) (finding no constructive discharge where plaintiff merely had difficult relationship with supervisor); *Rutkowski v. Sears Roebuck Corp.*, 210 F.3d 355, at \*4 (2d Cir. 2000) (unpublished table decision) ("Difficult or unpleasant working conditions are not enough to support a claim of constructive discharge." (internal quotation marks and citation omitted)).

Summary judgment is therefore granted on the constructive-termination claim.

## III.     Tortious Interference with Business Relationship

Plaintiff's final count, Count IV, claims tortious interference with his business relationship with UCS.  Compl. ¶¶ 97-105.  Under New York law, to state a claim for tortious interference with business relations, a plaintiff must allege that: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship."  *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008).  "[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff [him]self, but at the party with which the plaintiff has or seeks to have a relationship."  *Armored Grp., LLC v. Homeland Sec. Strategies, Inc.*, No. 07-cv-09694, 2009 WL 1110783, at \*2 (S.D.N.Y. Apr. 21, 2009) (quoting *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1104 (N.Y. 2004)).

As an initial matter, Plaintiff argues that Defendant's opening brief did not expressly discuss this claim and therefore sought only partial summary judgment.  Opp. at 7.  But as Defendant's reply makes clear, Defendant's arguments regarding the relative roles of the COA

31

and UCS in the actions taken against Plaintiff apply with equal force to this claim.  Reply at 8.

Plaintiff had a fair opportunity to address that issue.  The Court therefore resolves it now.

First, Plaintiff's tortious-interference claim fails out the outset because it concerns the

COA's conduct toward Plaintiff, rather than its conduct toward UCS, the party with which

Plaintiff has a relationship.  *See Armored Grp., LLC*, 2009 WL 1110783, at *2.

Second, Plaintiff's tortious-interference claim nevertheless fails because Plaintiff fails to

establish essential elements of the claim.  Plaintiff's business relationship was with UCS, his

employer.  To sustain this tort claim, Plaintiff would have to show that the COA intentionally

interfered with that relationship through wrongful means.  But the evidence he offers shows, at

most, that Quirk involved himself in Plaintiff's disputes with UCS, failed to oppose transfers

Plaintiff considered disciplinary, and did not secure the courthouse assignments Plaintiff wanted.

Plaintiff also alleges, in a conclusory fashion, that the COA "colluded" with UCS.  Opp. at 14.

Yet Plaintiff has supplied no evidence of such collusion, Rocco Tr. at 75:24-76:3 (testifying that

he has no documentary evidence in support of Count IV), and Plaintiff's own assertions cannot

fill that void, *see Vaughn v. Consumer Home Mortg. Co., Inc.*, No. 01-cv-07937 (ILG), 2006 WL

2239324, at *13 (E.D.N.Y. Aug. 4, 2006) ("A conclusory statement, unsupported by evidence, is

insufficient to survive a motion for summary judgment.").

The record instead reflects that UCS hired Plaintiff, supervised him, investigated him,

removed his firearm, received his medical documentation, returned him to work, and assigned

him to courthouses.  Plaintiff's allegations against the COA concern advocacy, acquiescence,

and commentary — not independent tortious conduct.  Even if a jury accepted Plaintiff's view

that Quirk sided with UCS and represented Plaintiff poorly, that would not establish the

improper means required for tortious interference.  *Criscione Ravala, LLP v. Canadus Power*

*Sys., LLC*, No. 18-cv-02516 (KBF), 2018 WL 4278348, at *2 (S.D.N.Y. July 31, 2018) ("New

York law required an allegation of a 'wrongful purpose' or 'dishonest, unfair, or improper means' as an element of a tortious interference claim."); *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 298 (S.D.N.Y. 2023) ("[T]he use of wrongful or improper means generally requires conduct 'that amounts to a crime or an independent tort.'" (alteration adopted) (quoting *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004)).

Nor does the record support a finding that the COA acted solely out of malice toward Plaintiff. *See TileBar v. Glazzio Tiles*, 723 F. Supp. 3d 164, 206 (E.D.N.Y. 2024) ("To state [a tortious interference] claim under New York law, a plaintiff must allege that . . . the defendant acted solely out of malice, or used dishonest, unfair, or improper means[.]" (internal quotation marks and citation omitted)); *accord Granger v. Gill Abstract Corp.*, 566 F. Supp. 2d 323, 333 (S.D.N.Y. 2008); *see also Katz v. Travelers*, 241 F. Supp. 3d 397, 404 (E.D.N.Y. 2017) (finding that, under New York law, a claim for tortious interference with a business relationship is identical to a claim for tortious interference with prospective economic advantage).

Summary judgment is therefore granted on Plaintiff's tortious-interference claim as well.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the motion at Dkt. 35 and CLOSE the case.

Dated: March 31, 2026
      New York, New York

SO ORDERED.

_____
JENNIFER L. ROCHON
United States District Judge

33